IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY ___ D.C.

05 OCT 17 AM 11: 05

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

NACCO MATERIALS HANDLING
GROUP, INC., d/b/a YALE MATERIALS
HANDLING CORPORATION,

    Plaintiff,

v.

                                   No. 03-2561 B A

TOYOTA MATERIALS HANDLING
USA, INC., and THE LILLY COMPANY,

    Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S APPLICATIONS FOR A PRELIMINARY INJUNCTION

---

This case involves claims by Plaintiff, NACCO Materials Handling Group, Inc. doing business as Yale Materials Handling Corporation ("Yale"), against Defendant Toyota Materials Handling USA, Inc. ("Toyota"), for unlawful procurement of breach of contract in violation of Tennessee Code Annotated § 47-50-109 (2001) and for a declaratory judgment against Defendant The Lilly Company ("Lilly") finding two dealership contracts between Yale and Lilly terminated based upon Lilly's breach. Before the Court are two applications for a preliminary injunction by Lilly filed on January 19, 2005 and May 5, 2005. As a hearing has been held on the applications in which the parties were permitted to submit testimony and arguments, the applications are now appropriate for disposition.

### BACKGROUND

The background facts of this case were set out in full in the Court's November 23, 2004 Order granting Lilly's first application for a preliminary injunction. See Nacco Materials

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 10-17-05



Handling Group, Inc. v. Toyota Materials Handling USA, Inc., 366 F. Supp. 2d 597 (W.D. Tenn. 2004). Thus, the Court will only address facts and arguments not presented previously. Yale, as an operating division of NACCO, manufactures and supplies lift trucks. Lilly is a Yale retailer which resells and services lift trucks in parts of Tennessee, Mississippi, and Arkansas under two different agreements which were renewed and entered into on July 2, 2002. Agreement 062 granted Lilly the exclusive right for three years to sell and service Yale products in the Memphis area (hereinafter "Memphis agreement"). The other agreement, Agreement 050, gave Lilly the same three year term for the middle Tennessee area, including Nashville (hereinafter "Nashville agreement").

Included in both agreements is Section 3.15 which provides that the "[d]ealer [Lilly] agrees not to sell or offer for sale during the term of the Marketing Agreement new equipment which competes directly with Yale Products." (Answer Am. Compl. Counter-Compl. Ex. A & B.) Section 3.14 of the marketing agreements contains two clauses, a best efforts provision, stating that the dealer "shall actively develop, preserve and promote the goodwill and reputation of Yale, its goods and services," and a business ethics clause, requiring the dealer to "exercise commercial good faith and honesty in its business dealings with Yale and third parties." (Answer Am. Compl. Counter-Compl. Ex. A & B.) Additionally, both agreements include trademark provisions regulating how Yale's trademarks may be used by a dealer. Section 8.1 allows Lilly to use Yale's trademark "but only in accordance with Yale's policies."[1] (Answer Am. Compl. Counter-Compl. Ex. A & B.) Finally, both agreements require, pursuant to Section 3.1, Lilly to "obtain and maintain in the

---

[1] Section 8.5 contains similar language stating that the "[d]ealer will indicate on its letterhead, signs, service trucks and in any other methods of identifying itself to the public that Dealer is an authorized dealer of Yale Products in the Management Unit, all in accordance with policies established by Yale from time to time and authorized in writing." (Answer Am. Compl. Counter-Compl. Ex. A & B.)

Management Unit the market share of new units sold and leased set forth in the Marketing Plan for each major category of Yale Products." (Answer Am. Compl. Counter-Compl. Ex. A & B.)

In July 2003, Lilly decided to become a lift truck retailer for Toyota in Memphis. Yale filed this lawsuit based on Lilly's alleged breach of the Memphis and Nashville agreements. As a result, Lilly filed an application for a preliminary injunction on August 7, 2003 seeking to prevent Yale from terminating the dealership agreements. After a hearing on the application, the Court issued an injunction which prohibited Yale from terminating the agreements. See Nacco, 366 F. Supp. 2d at 611.

On November 19, 2004, Yale sent Lilly a notice indicating that Yale would not be renewing the Memphis and Nashville agreements and would allow the agreements to expire on July 2, 2005 which was the end of the three year term. (Application Prelim. Inj. Lilly Company at 1 (hereinafter "Lilly's Application II at __).) In response, Lilly filed its second application for a preliminary injunction.

On April 8, 2005, Yale sent Lilly a Notice of Default under the Memphis and Nashville Agreements after Lilly acquired the Cumberland Clarklift, Inc. dealership in Knoxville, Tennessee, which carries lift trucks made by competing manufacturers Clark, Linde, and Daewoo. (Application Prelim. Inj. Lilly Company at 1-2 (hereinafter "Lilly's Application III at ___.").) The notice stated that Lilly had breached several provisions of the Memphis and Nashville Agreements by failing to comply with the "best efforts" provision and violating Yale's policies regarding the use of its trademarks. Consequently, Lilly filed its third application for preliminary injunction to prevent Yale from terminating the Nashville and Memphis Agreements. However, as the terms of the two agreements expired on July 2, 2005, the primary issue before the Court is whether Yale may refuse

3

to renew the contracts.  Therefore, the arguments presented by Yale in its April 8 notice and in Lilly's third application for an injunction will be addressed in conjunction with the question of whether Yale has good cause not to renew the dealer agreements.

ANALYSIS

As set forth in the Court's prior order, in ruling on a preliminary injunction under Federal Rule of Civil Procedure 65, a court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." Rock and Roll Hall of Fame and Museum v. Gentile Prods., 134 F.3d 749, 753 (6th Cir. 1998). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." Jones v. City of Monroe, 341 F.3d 474, 476 (6th Cir. 2003). "While the Court need not consider any single factor as either indispensable or dispositive, neither is it required to conclude that all four support its decision." De Boer Structures (U.S.A.) Inc. v. Shaffer Tent and Awning Co., 187 F. Supp. 2d 910, 919 (S.D. Ohio 2001). "The Court's discretion is directed at the weight to be given each factor, and the effect to be accorded their mix." Id. (citing In re Eagle-Picher Indus., Inc., 963 F.2d 855, 859 (6th Cir. 1992).

1. Likelihood of success on the merits

As with the first application for injunction, to properly determine whether Lilly might succeed on the merits, the Court must examine the Tennessee statutory law applicable to this dispute. Tennessee Code Annotated § 47-25-1302 states that "[n]o supplier, directly or through an officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive

4

circumstances of a retail agreement without good cause." Tenn. Code Ann. § 47-25-1302(a). "Good cause" is defined as a "failure by a retailer to comply with requirements imposed upon the retailer by the retail agreement if such requirements are not different from those imposed on other retailers similarly situated in this state." Tenn. Code Ann. § 47-25-1302(a). Tennessee law also provides that a supplier may not "[c]oerce a retailer into refusing to purchase equipment manufactured by another supplier." Tenn. Code Ann. § 47-25-1304(c). Further, "[a]ny contractual term restricting the procedural or substantive rights of a retailer under this part, including a choice of law or choice of forum clause, is void." Tenn. Code Ann. § 47-25-1312. Additionally, § 47-25-1313 makes plain that "[t]he provisions of this part shall not be waivable in any contract, and any such attempted waiver shall be null and void." Tenn. Code Ann. § 47-25-1313(a).

Yale argues that it has good cause not to renew the agreement under § 47-25-1302(a) because of Lilly's failure to comply with the exclusivity provision in Section 3.15, the "best efforts" clause contained in Section 3.14, the commercial good faith and honesty requirements in Section 3.14, the trademark provisions contained in Sections 8.1 and 8.5, and Sections 3.1 and 3.2 which require Lilly to maintain a market share of 17% for the Memphis Agreement for 2004. (Yale's Proposed Findings Fact Conclusions Law at 12-21 (hereinafter "Yale's Findings").) The Court will address each of Yale's arguments in turn.

### A. The Exclusivity Provision

Yale submits that the exclusivity clause is not limited to a specific territory or management unit. (Yale's Findings at 12.) Additionally, the Plaintiff contends that § 47-25-1304(3) does not expressly prohibit exclusivity clauses but instead only prohibits a supplier from "coerc[ing] a retailer into refusing to purchase equipment manufactured by another supplier." (Yale's Finding at 13-14.)

Finally, according to Yale, "there is no evidence of any threat or coercion at the time Lilly agreed to be an exclusive dealer and no evidence of any threat or coercion in connection with the notices of non-renewal." (Yale's Findings at 14.)    In response, Lilly insists that the statutory language does not limit the prohibition against coercion to only when the contract is executed and that Yale's conduct in threatening to terminate and not renew the Memphis and Nashville Agreements is coercive in that it seeks to restrain Lilly's unwaivable right to purchase equipment from another supplier. (Lilly Company's Proposed Findings of Fact and Conclusions of Law at 13-14 ("Lilly's Findings").)

The Court considered and ruled on this argument in granting Lilly's initial application for a preliminary injunction. Likewise, here, the Court is persuaded that Lilly is likely to prevail on the merits in preventing Yale from terminating the agreements based on the exclusivity provision. As stated in the previous order, the Tennessee statute in question offers significant protection to retailers, see Power & Telephone Supply Co., Inc. v. Harmonic Inc., 268 F. Supp. 2d 981, 987 (W.D. Tenn. 2003), and § 47-25-1313 provides that the protection "shall not be waivable in any contract." Tenn. Code Ann. § 47-25-1313(a). Based on this statute, the Court concluded that the prohibition against coercing a retailer to deal exclusively with one supplier could be violated at any time because the protection is unwaivable. See Nacco, 366 F. Supp. 2d at 607-08. Thus, the only issue is whether Yale's attempt to not renew the contractual agreements with Lilly could be viewed as coercive conduct under § 47-25-1304(3). Although the statute does not define, and no case law has been found or cited to which defines, the term "coerce," the ordinary meaning, as noted in the Court's earlier injunction order, is "to restrain or dominate by force . . . or threat." Webster's Collegiate Dictionary 222 (10th ed. 1993). In providing notice to Lilly that it will not renew its contractual

agreements based on Lilly's failure to deal exclusively with Yale, Yale is, in essence, coercing Lilly to deal with Yale exclusively "or else." The Courts finds that this is likely the sort of conduct which the Tennessee legislature intended to prohibit and which is not subject to waiver. Accordingly, the Court concludes that Lilly has a strong likelihood of success in seeking to prevent Yale from not renewing the contracts based on Lilly's failure to comply with Section 3.15. See Minnesota Supply Co. v. The Raymond Co., No. 99-832, at 12-13 (D. Minn. Memorandum Opinion and Order Sept. 26, 2003 (attached to Appendix of Pre-Hr'g Br. Lilly Co.)). As Lilly points out, Yale's decision not to renew the Memphis and Nashville agreements based on the fact that Lilly buys equipment from Toyota is a form of coercive conduct seeking to restrain Lilly's unwaivable right to do so under § 47-25-1304(3).

Yale argues that if the exclusivity provision in the agreements is voided by Tennessee law, then the whole agreement fails because that was the essence of what the parties exchanged as consideration for the contract. (Yale Opp'n Applications Prelim. Inj. The Lilly Company at 12.) Plaintiff points to James Cable Partners v. City of Jamestown, 818 S.W.2d 338, 345 (Tenn. Ct. App. 1991) as support for its argument. (See June 1, 2005 Transcript of Proceedings at 40 (hereinafter Tr. II at ____).) However, in James Cable Partners, the Tennessee Court of Appeals held that "partial failure of consideration is not grounds for rescission unless the failure defeats the very object or purpose of the contract." Id. The court found that there was not a total failure of consideration because only part of the consideration was preempted by the Cable Communications Act and the plaintiff was still "required to comply with several conditions as consideration." Id.

Here, as Yale points out, Lilly is also required to use its best efforts to actively solicit potential customers and promote the goodwill and reputation of Yale products under Section 3.14

7

and must maintain a certain percentage of market share for Yale under Section 3.1.  (Answer Am. Compl. Counter-Compl. Ex. A & B.)  The Court finds that these promises, among others, are also part of the consideration provided under the terms of the contracts.  Thus, § 47-25-1304(3), which under the circumstances of this case would void the exclusivity provision in Section 3.15 of the agreements, only nullifies one of many promises made by Lilly to Yale in the agreements. Accordingly, the Court concludes that the "preemption of this provision [does] not destroy the principal object of [these] contract[s]."  See James Cable Partners, 818 S.W.2d at 345.

### B.  The Best Efforts and Market Share Provisions

Yale contends that Lilly failed to comply with the best efforts provisions of the two agreements by promoting both Yale and Toyota in Memphis.  (Yale's Findings at 14-15.)  The Plaintiff points to the fact that several Lilly employees conceded that the Defendant used the same salesmen to market both Yale and Lilly products throughout 2003.  (Yale's Findings at 15; Tr. II, Ex. 7 Deposition of Thomas J. Clark, III at 71, Ex. 10 Deposition of Craig Avery at 31, Ex. 33 Deposition of Dustin Benetz at 51.)  In January 2004, Lilly created two different sales departments, designating some salesmen as Yale representatives and others as Toyota representatives. (Lilly's Findings at 14-15.)  Nevertheless, at least one of the salesmen continued to represent both brands until December 2004.  (Tr. II, Ex. 33 Benetz dep. at 51; Yale's Findings at 15.)  Additionally, Yale cites to the fact that Lilly sent letters to customers promoting Toyota as "the world's leading forklift truck manufacturer" and proposals which included the language:  **"Toyota, World's #1 Manufacturer of Forklift Trucks!"** (Tr. II, Ex. 13 (bold in original).)  Moreover, Shankar Basu, the President of Toyota, testified at his deposition that Lilly was not required to include such language in its proposals.  (Tr. II, Ex. 15 Deposition of Shankar Basu at 119.)  Further, Yale

highlights the fact that Lilly has an advertisement in the FedEx Forum in Memphis, Tennessee, which included the Lilly and Toyota names, but not Yale's. (Tr. II, Ex. 7 Clark dep. at 111-112.)

As further support for its argument that Lilly was not using its best efforts to promote Yale products and as evidence that Lilly had breached Section 3.1 of the agreements, Plaintiff points to Lilly's decline in market share for Yale products, which has occurred since Lilly started representing Toyota.  Under Section 3.1 of the agreements, Lilly agreed to maintain a market share for Yale of 17% for the Memphis location during 2004. (Yale's Findings at 20.) At his deposition, Craig Avery, chief operating officer for Lilly, testified that, although Lilly's share for Yale in Memphis was over 17% in 2003, that figure dropped to 9.5% in 2004 and to 8.1% at the end of the first quarter of 2005. (Tr. II, Ex. 10 Avery dep. at 67-69.)

Finally, Yale submits that Lilly cannot use its best efforts to promote Yale when it markets both Yale and Toyota products to the same customers.  The president of Lilly stated at his deposition that Lilly actively and regularly promotes Toyota and Yale products to all customers in the same territory that is covered by the Yale Memphis agreement, although with a split sales staff.  (Tr. II, Ex. 7 Clark dep. at 19-20.)  Quoting Joyce Beverages of New York, Inc. v. Royal Crown Cola Co., 555 F. Supp. 271, 275 (S.D.N.Y. 1983), Plaintiff asserts that "[u]sing the same relationships 'developed in the promotion of [Yale] for the promotion of [Toyota] breach[ed] the best efforts clause both factually and legally.'" (Yale's Findings at 16 (alterations in original).)

Conversely, Lilly contends that it has complied with the best efforts clause because it has divided its sales force so that some salesmen are focusing solely on marketing Yale brand products. (Lilly's Findings at 14-15.)  As evidence of its efforts, Lilly points to the increase in market share since the end of March 2005.  Avery testified at the June 1, 2005 injunction hearing that Lilly's year-

to-date market share in Memphis was 16.9%. (Tr. II at 78.) Additionally, Lilly maintains that Yale's failure to work with it on various promotions and training is the cause of its drop in market share. At the June hearing, William Pfleger, vice-president of dealer development for Yale, conceded that Lilly has been excluded from strategic meetings since 2003 and that Yale refused an order in October 2004 placed by Lilly for some of its new products. (Tr. II at 218-19.) Nevertheless, according to Yale's president, Donald Chance, the Plaintiff began accepting orders from Lilly in late November 2004 after the Court issued the injunction. (Tr. II, Ex. 49 Deposition of Donald Chance at 89.) Lilly also cites to the fact that Yale began training other Yale dealers on its newest products, the Veracitor GC-VX line, in October and November of 2004. (Tr. II, Ex. 46 Deposition of Jon Levine at 46.) However, Jon Levine, the Yale representative responsible for the sales launch, admitted that he received an email on November 8, 2004 from Pfleger stating that "Yale is not providing any information to Lilly as it relates to the VX series." (Tr. II, Ex. 46 Levine dep. at 18.) But Levine further testified that Lilly was eventually trained on the Veracitor products in January 2005. (Tr. II, Ex. 46 Levine dep. at 46.)

Lilly also claims that its market share decrease was due to other problems with Yale. In October 2004, Yale ran out of inventory of certain types of lift trucks. (Tr. II, Ex. 49 Chance dep. at 84.) The Defendant cites this fact as an additional reason that its market share dropped in 2004 and continued to drop in 2005. Avery testified that Cleo Wrape, a Lilly customer, wanted to order trucks in November 2004 but Lilly did not have access to the Yale trucks they were requesting because the existing models were sold out and Lilly was not allowed to order the Veracitor products at that time. (Tr. II, Ex. 10 Avery dep. at 71-72.) In addition, in December 2003, Lilly ordered 100 trucks from Yale to be sold to AutoZone before Lilly had received a written commitment from the

customer. (Tr. II, Ex. 10 Avery dep. at 73.) Several months later, the deal fell through. As a result, Lilly absorbed the trucks into its inventory for 2004 which caused Lilly to order less trucks in that year, thereby causing its market share to decrease. (Tr. II, Ex. 10 Avery dep. at 70-71.) Similarly, Thomas F. Clark, a sales manager for Lilly, testified that Lilly lost a deal with Terex, a prospective customer, because it was concerned about the lawsuit between Yale and Lilly and was afraid that if Lilly lost, it would not be able to service its account. (Tr. II, Ex. 28 Deposition of Thomas F. Clark at 67-69.) Chance, Yale's president, likewise conceded that he spoke with representatives of Terex, who seemed to be concerned about an interruption in service if they purchased Yale products from Lilly. (Tr. II., Ex. 49 Chance dep. at 105-06.)   Additionally, Clark testified that an advertisement for Yale and Lilly at the FedEx Forum was not possible because Lilly could not obtain any cost sharing from Yale as it did with Toyota. (Tr. II, Ex. 7 Clark dep. at 112.)

Finally, Lilly points to the fact that several other Yale dealers had low percentages of market share for the Plaintiff but were not sent a notice of nonrenewal. When Pfleger was questioned about one such dealer who had a 9.7% market share in 2003 and a 9.8% market share in 2004, he confirmed that the dealer had not been terminated. (Tr. II, Ex. 51 Deposition of William Pfleger Vol. II at 10.) Similarly, another dealer's performance, which was 11.4% in 2003, dropped to 9.7% in 2004, failing to meet the target market percentage set by Yale. (Tr. II, Ex. 51 Pfleger dep. Vol. II at 32.) Nonetheless, that dealer was not sent a notice of default or nonrenewal. (Tr. II, Ex. 51 Pfleger dep. Vol. II at 33.)

The Court first turns to the Nashville agreement. With respect to it, Plaintiff has not cited to any evidence establishing that Lilly has failed to use its best efforts to promote Yale products. Instead, Yale argues that the best efforts provision is a global requirement which applies to both

agreements.  (Tr. II at 21.)  However, as the Court stated in its initial order granting Lilly's application for a preliminary injunction, the Memphis and Nashville contracts were executed separately and each included integration clauses drafted by Yale stating that each document contained the entire agreement between the parties. See Nacco, 366 F. Supp. 2d at 603-04.  The Court remains inclined to view the best efforts clause as specific to that agreement and locality. Moreover, Lilly has submitted proof demonstrating that the Yale market share in Nashville in 2004 was 17.3% and as of March 31 was 18.7% for 2005. (Tr. II, Ex. 10 Avery dep. at 70.)  Furthermore, Pfleger testified that Yale had no evidence that Lilly had ever sold any Toyota forklifts in the Nashville area. (Tr. II, Ex. 51 Pfleger dep. at 96.)  Accordingly, the Court finds that Lilly has used its best efforts to promote Yale in the Nashville area as required under the Nashville agreement. Thus, Lilly's failure, if any, to comply with the best efforts provision of the Memphis agreement does not constitute good cause to not renew the Nashville contract.

As to the Memphis agreement, however, the Court concludes that Lilly does not have a strong likelihood of success in establishing that it has complied with the best efforts provision, at least for the period of time when its salesmen actively promoted both Toyota and Yale to the same customers. Although Lilly claims that Yale is using the best efforts provision as another way of making Lilly forfeit its right to sell equipment produced by another supplier, the Court is not convinced that using best efforts to promote a particular brand requires the dealer to exclusively promote a single brand.[2] For example, NACCO, the parent company of Yale and Hyster Company, promotes both companies with a divided marketing and sales force which tries to sell to all customers regardless of their loyalty

---

[2] If the Court were to interpret the best efforts provision to require Lilly to deal exclusively with Yale, such an interpretation might run afoul of § 47-25-1304(3) and undo the protection it provides.

to the other group. (Lilly's Findings at 2-3.) Lilly implemented a similar plan in 2004 by separating the sales staff into representatives for either Yale or Toyota. (Lilly's Findings at 11.) Had this been done immediately after Lilly became a Toyota dealer, the Defendant may have been able to comply with the best efforts provision during this period of time. However, Yale's reliance on <u>Joyce Beverages</u> as support for its argument that Lilly is still in violation of the best efforts provision is misplaced because in that case, as opposed to the present lawsuit, the dealer at no time had a split sales and marketing department. <u>See Joyce Beverages</u>, 555 F. Supp. at 273-75. Moreover, the court in <u>Joyce Beverages</u> plainly stated "[a] best efforts clause is not *per se* breached by a mere undertaking of a competitive product line . . . it depends on the circumstances." <u>Id.</u> at 275. Nonetheless, because Lilly allowed the same salesmen to offer to its customers both Yale and Toyota products from August 2003 until January 2004 (<u>see</u> Lilly's Findings at 14-15), the Court finds that Lilly will not likely succeed in establishing that it complied with the best efforts provision during this period of time.[3]

    With regard to Lilly's market share for Yale under the Memphis agreement, the Court finds

---

[3] Under Tennessee Code Annotated § 47-25-1302(b), Lilly had a sixty-day right to cure the deficiency in its failure to comply with the best efforts provision. However, because Lilly officially began promoting Toyota in August 1, 2003 and continued to promote Toyota and Yale products through the same sales staff throughout 2003, its right to cure expired before it divided its sales department. The Court further notes that a ninety days' written notice of termination was not required because subsection (b) provides that "notice is not required if the reason for termination, cancellation or nonrenewal is a violation under the provisions of subsection (a)." Tenn. Code Ann. § 47-25-1302(b). As previously stated, subsection (a) allows a supplier to terminate or not renew a retail agreement for "good cause," which is defined as a retailer's failure to comply with a requirement that is not different from those imposed on other retailers similarly situated in the state. Tenn. Code Ann. § 47-25-1302(a). Even so, Lilly's counsel received a letter dated August 5, 2003 from Yale's counsel plainly citing to Sections 3.14 and 3.15 of the contracts. (<u>See</u> Pre-Hr'g Br. The Lilly Company, Ex. G.) Thus, Lilly apparently had notice.

that the evidence is equivocal.  Although Defendant's Yale market share had decreased to 9.5% in 2004, Lilly's year-to-date market share for 2005 in Memphis was 16.9% as of the June 1 hearing. (Tr. II at 78.)  Moreover, Lilly submitted testimony that it had difficulty placing orders and obtaining trucks to sell to customers based on Yale's rejection of orders and its lack of inventory to fill other requisitions.   (Tr. II at 218-19 & Ex. 49 Chance dep. at 84.)   Additionally, Tennessee Code Annotated § 47-25-1302(b) provides that "where cancellation is enacted due to market penetration, a reasonable period of time shall have existed where the supplier has worked with the dealer to gain the desired market share."

### C. Commercial Good Faith and Honesty Provision

Yale contends that Lilly has also breached that part of Section 3.14 which requires it to exercise commercial good faith and honesty in its business dealings with the Plaintiff.  According to Plaintiff, Lilly made misrepresentations concerning its plans to become a Toyota dealer,[4] concealed out-of-territory parts sales after representing that it had stopped making the shipments, and misrepresented the status of an order for 100 units for AutoZone which enabled Lilly to receive a cash prize.[5]  (Yale's Findings at 17.)

---

[4] Although this argument was raised in opposition to Lilly's first application for a preliminary injunction, Yale submits that at that time, depositions of Toyota representatives had not been taken.  Consequently, the Court will revisit this argument and consider the additional testimony.

[5] Yale also asserts that Lilly's repudiation of the exclusivity clause is a breach of trust to Yale and other Yale dealers because only by agreeing to that provision was Lilly able to expand its territory to Nashville.  However, based on the Court's holding with regard to the exclusivity clause, the Plaintiff's argument is unavailing.  It cannot accomplish with Section 3.14 what § 47-25-1304(3) prohibited under Section 3.15.  Lilly has the unwaivable right to be free from coercion with regard to purchasing equipment from another supplier.  Tenn. Code Ann. § 47-25-1304(3).  Yale has not cited to any case law establishing that exercising that statutory right could constitute a breach of trust.

14

With regard to Lilly's truthfulness about its negotiations with Toyota, Basu, the president of Toyota, testified that Craig Avery contacted him in March 2003 and informed him that Lilly was interested in becoming a Toyota dealer in the Memphis area. (Tr. II, Ex.15 Basu dep. at 54-55.) On March 17, 2003, Avery went to Toyota's facility in California "as an orientation meeting for him to understand Toyota" and met with the heads of different departments. (Tr. II, Ex. 15 Basu dep. at 70-71.) After meeting on several more occasions, Avery submitted a written proposal to Basu on June 18, 2003. (Tr. II, Ex. 15 Basu dep. 76-79.) On July 3, 2003, Jon Levine, a vice president of Yale, called Avery and asked him if rumors were true that Lilly was going to become a Toyota dealer in the Memphis area. (November 19, 2003 Transcript of Proceedings at 150 (hereinafter "Tr. I at ___").) According to Levine, in answering the question, Avery related that

> [w]e are not doing anything with them. Maybe, you know, I am acquiring a small independent up in Jackson, Tennessee, and maybe there is some rumor in the market place because of that. But, . . . Yale has nothing to worry about, you know, there is nothing going on between us and Toyota, and there is no foundation for the rumor.

(Tr. I at 151.) Then, on July 9, 2003, Lilly executed a letter of intent stating that it was to become a Toyota dealer. (Tr. II, Ex. 15 Basu dep. at 84 & Ex. 17 Confidential Letter of Intent to Purchase.) On July 15, Levine again spoke with Avery who informed the Yale representative that Lilly was merely buying the assets of a former Toyota dealer and assured him that "we haven't even talked to Toyota about any dealer commitments, we haven't signed anything." (Tr. I at 155.) Finally, on July 21, 2003, Clark, president of Lilly, told Yale that Lilly was considering an offer to become a Toyota dealer and that he would let them know of Lilly's final decision in several days. (Tr. I at 79.) Thereafter, Lilly had a meeting with its board of directors and decided to proceed with the Toyota deal. (Tr. I at 88.)

15

Yale also contends that Lilly was dishonest about selling parts out of the Memphis territory. Lilly sold Yale parts to several companies in Mexico beginning in 1992 knowing it was in violation of the Yale agreement. (Tr. II, Ex. 44 Deposition of Jerry Crouch at 72 & Ex. 7 Clark dep. at 45.) In 1999, Clark informed Jay Costello of the parts sales and told him that Lilly would stop the sales immediately. (Tr. II, Ex. 42 Costello dep. at 93-94.) As a result of losing the parts sales, Jerry Crouch, a parts manager for Lilly, requested a downward adjustment in performance goals used to calculate incentive rewards for Lilly. (Tr. II, Ex. 42 Costello dep. at 95-96.) Costello agreed and Lilly's performance goals were reduced. (Tr. II, Ex. 42 Costello dep. at 94-95.) Nevertheless, Crouch testified at his deposition that it became common practice for Lilly to make shipments to Mexico after 1992. (Tr. II, Ex. 44 Costello dep. at 72.) Indeed, Crouch conceded at least six such shipments were made in 2004 as well as one in February and another in March of 2005. (Tr. II, Ex. 44 Costello dep. at 70-71.)

Lilly maintains that Costello officially approved of its shipments to Mexico after it explained that one of the customers was not getting service from any Yale dealers.[6] (Tr. II, Ex. 44 Crouch dep. at 85.)   Clark testified that Costello approved of Defendant's sale of parts to one of the two customers which Lilly had been shipping to in Mexico.  (Tr. II, Ex. 7 Clark dep. at 46-48.) Additionally, Lilly points to the hearing testimony of Donald Chance where he indicated that Yale had never terminated a dealer or failed to renew an agreement based on a dealer's selling parts out of its territory. (Tr. II at 196.)

---

[6] Lilly also contends that the Court need not consider evidence regarding out-of-territory parts sales because the purported violation was not specifically set forth in any of the notices of default. However, as stated above, because Yale is seeking to terminate the agreement under § 47-25-1302(a) for Lilly's failure to comply with the requirements in the retail agreement, notice is not required. See Tenn. Code Ann. § 47-25-1302(b).

Finally, Yale claims that Lilly violated the commercial good faith and honesty clause by ordering 100 Class III forklift trucks in December 2003 to be sold to AutoZone even though the Defendant did not have an order from the customer.  (Yale's Findings at 10.)  As a result of the order, Lilly qualified for an incentive payment prize of $28,000.  (Tr. II at 214.)  The deal ultimately did not materialize, however, and according to Avery, Lilly only learned of AutoZone's decision not to proceed with the arrangement in late January or early February of 2004.  (Tr. II at 244 & Ex. 10 Avery dep. at 75.)  Nevertheless, Craig Avery admitted during his deposition that Lilly had never received a written order for any products in 2003 from AutoZone or a written cancellation for any orders from AutoZone.  (Tr. II, Ex. 10 Avery dep. at 94.)  At the June 1 hearing, Pfleger testified that if a special pricing order was cancelled, the dealer was to call the Yale sales department and inform them, with the result that the pricing reverted back to the original price, and the dealer was required to pay the difference between the special and the original pricing.  (Tr. II at 213-14.)  In his deposition, Avery testified that he informed Yale in late January 2004 that AutoZone was not going to buy the trucks.  (Tr. II, Ex. 10 Avery dep. at 75.)  Avery also stated that Lilly received a letter in June 2004 from Costello reflecting that everything was in order after Yale conducted an audit on trucks sold to Lilly at special pricing.  (Tr. II at 245.)  However, Pfleger stressed at the June 1 hearing that if Lilly had communicated to Yale about the AutoZone order in January or February, the Defendant would not have qualified for the prize.  (Tr. II at 215.)

The Court finds that Lilly does not have a strong likelihood of success in preventing Yale from terminating the Memphis agreement, and possibly the Nashville agreement, based on violations of the good faith and commercial honesty provisions by not being forthright with Yale about Lilly's negotiations with Toyota.  Although "honesty" is not defined in the agreements, the ordinary

meaning of the term is defined as "fairness and straightforwardness of conduct." Webster's Collegiate Dictionary 556 (10th ed. 1993). In addition, as Plaintiff points out, the Tennessee Supreme Court has held that commercial good faith and honesty requires "honesty in fact in the conduct of the transaction involved." First Citizens Bank v. Citizens and Assoc., 82 S.W.3d 259, 264 (Tenn. 2002) (citing to Tenn. Code Ann. 47-1-201(19) which defines "good faith" as "honesty in fact in the conduct or transaction concerned"); see also Glazer v. First Am. Nat'l Bank, 930 S.W.2d 546, 549-50 (Tenn. 1996) (adopting Webster's Dictionary definition of the term "honesty" and defining it as "fairness and straightforwardness of conduct").

Over a week after Lilly submitted a proposal to Toyota, Levine plainly asked Avery whether rumors were true that Lilly was to become a Toyota dealer, to which, according to Levine, Avery denied anything going on between Toyota and Lilly. (Tr. I at 151.) Similarly, a week later, Avery allegedly told Levine that "we haven't signed anything," which conversation occurred a few days after Lilly had entered into a letter of intent with Toyota. (Tr. I at 155; Tr. II, Ex. 15 Basu dep. at 84 & Ex. 17 Confidential Letter of Intent to Purchase.) Although Lilly did not officially agree to become a Toyota dealer until after a meeting of the board of directors at the end of July, it was not completely aboveboard with Yale about its negotiations with Toyota. This conclusion is not inconsistent with the Court's initial order because, based on what was presented at that time, the Court found that the evidence did not favor either party. See Nacco, 366 F. Supp. 2d at 609. In light of new testimony submitted to the Court, it concludes that Lilly most likely failed to comply with the commercial good faith and honesty provision in Section 3.14.

With regard to the Nashville agreement, the Court finds that Lilly's violations of the commercial good faith and honesty provision by actions taken in the Memphis territory can have

18

consequences that extend to the Nashville agreement. The commercial honesty clause required Lilly to "exercise commercial good faith and honesty in its business dealings with Yale" which was not limited to any locality. The clause deals with general concepts of honesty and it is logical to conclude that such terms cannot be limited to location but instead extend to all relationships to which Lilly and Yale are a part. Accordingly, the Court determines that Lilly does not have a strong likelihood of success in preventing the nonrenewal of the Nashville agreement based on Lilly's dishonesty with Yale about its dealing with Toyota.

As to the out-of-territory parts sales and the AutoZone deal, the Court observes that the evidence is more equivocal. Although Lilly admitted violating the out-of-territory sales policy in 1992, Costello indicated that he was pleased that Lilly informed him of the violation. (Tr. II, Ex. 42 Costello dep. at 104.) Additionally, after 1992, Clark and Crouch both testified that Costello gave permission for Lilly to sell to one of its customers in Mexico. (See Tr. II, Ex. 7 Clark dep. at 46-48 & Ex. 44 Crouch dep. at 85.) Likewise, with respect to the AutoZone order, Avery related that he informed Yale of the loss of the order in late January 2004. (Tr. II at 244.) Moreover, Michael Dougherty, a Yale dealer located in North Carolina, who testified at the June 1 hearing, admitted he also had placed orders with Yale prior to obtaining a signed purchase order from a customer. (Tr. II at 128.) Furthermore, Avery stated that, after Yale conducted an audit of trucks held by Lilly which it purchased at special pricing, Costello sent a letter indicating that "they had no issues with us at all." (Tr. II at 245.)

### D. Trademark Provisions

Yale asserts that Lilly has violated Section 8.1 and 8.5 of the agreements which allow Lilly to use Yale's trademarks and trade names only in accordance with Yale's policies. According to the

Plaintiff, Lilly violated these policies by marketing Yale and Toyota products simultaneously, by posting a Toyota sign and logo on the same building where a Yale sign was displayed, and by showcasing Toyota products "side-by-side" with Yale products at its Memphis location. (Yale's Findings at 19.) However, Yale has not submitted any documents outlining what precisely Yale's policies are. Indeed, Costello admitted that he was unaware of any written documents detailing how Yale's logo was to be used. (Tr. II, Ex. 42 Costello dep. at 22-24.) Instead, according to Yale, "[o]ur policy is communicated to the dealers through our various management functions such as dealer development." (Tr. II, Ex. 42 Costello dep. at 23.) Clark testified that Yale's policies regarding its trade names and trademarks had never been explained to him. (Tr. II, Ex. 7 Clark dep. at 25.) Lilly cites to several other dealers which were allowed to sell and market multiple brands as well as display logos side-by-side without issue. For example, Black Equipment is a dealer for Yale and another manufacturer, Linde, and displays both logos on its website. (Tr. II, Ex. 42 Costello dep. at 38.) Similarly, Inslee-McIntee represents both Yale and Crown and has a sign for both at the same location. (Tr. II, Ex. 42 Costello dep. at 73.) By was of explanation, Plaintiff maintains that Inslee-McIntee entered into a different agreement than the one Lilly had and therefore was not in violation of it. (Yale's Findings at 20.) When asked about Black Equipment, Costello admitted that the company was displaying competing brands but he did not know if the dealer had permission to do so. (Tr. II, Ex. 42 Costello dep. at 39.) Moreover, Costello testified at his deposition that no dealer agreement had been terminated or not renewed for a violation of the Yale trademark policy. (Tr. II, Ex. 42 Costello dep. at 80-81.)

Based on the scant evidence presented on this issue by Yale, the Court is reluctant to find that Lilly violated Plaintiff's trademark policies. Yale has not presented any evidence as to the exact

nature of its trademark policies. Without such proof, the Court is unable to determine whether Lilly complied with Plaintiff's policies or not. As well, Costello conceded that he was unaware of any written trademark policy. (Tr. II, Ex. 42 Costello dep. at 22-24.) Accordingly, the Court finds that, based on the evidence presented, neither party has demonstrated a strong likelihood of success on the merits of this issue.

### 2. Irreparable harm to Lilly if an injunction is not issued

Lilly argues that if Yale is allowed to terminate the agreements, it will suffer irreparable harm. Irreparable harm is a harm which is not fully compensable by money damages. Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992). "[A]n injury is not fully compensable by money damages if the nature of the [claimant's] loss would make damages difficult to calculate." Id. (citing Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir. 1984)). For example, "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." Id. at 512 (citing Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1449 (11th Cir. 1991)).

Referring to both the Memphis and Nashville locations, Clark testified at the hearing that Lilly will have to release employees if Yale is allowed to terminate the agreements, the result of which would severely damage the morale of the company. As well, Lilly claims it would likely not be able to hire the employees back if later reinstated as a Yale dealer. (Tr. II at 54.) Additionally, according to Clark, Yale itself would be harmed by removing the Yale product from the marketplace for a period of time. (Tr. II at 55-56.)

In the Nashville location, according to the Defendant, approximately 50% of the employees would have to be terminated. (Tr. II at 58.) All parts service would be decreased because Lilly would

have to purchase the parts from another Yale dealer at an substantially higher price. (Tr. II at 59.) Additionally, Clark indicated that their customers would seek another dealer who could service them with more affordable parts and that they would not return even if Lilly was later reinstated as the dealer in Nashville. (Tr. II at 59-61.) Likewise, Lilly would lose the ability to sell new trucks to customers, who once they went to other dealers, would most likely not return because "[Lilly's] reputation [was] on the line, too." (Tr. II at 75.) Further, Avery attested that if the Nashville location were terminated, operations would "shut down" within 90 days. (Tr. II at 74.)

According to Clark, if the dealership in Memphis were terminated, customers would feel Lilly was not dependable and on the verge of bankruptcy. (Tr. II at 62.) Clark testified that such action would place Lilly back in a business position it held "three, four, five years ago." (Tr. II at 63.) Clark similarly stated at his deposition that Lilly's revenues would return to the June 2003 level before it took on the Toyota line. (Tr. II, Ex. 7 Clark dep. at 123.) Craig Avery also related that 80% of its parts sales were Yale parts which Lilly could only buy at 92% markup over a dealer's cost if it lost the dealership. (Tr. II at 77.) As a result, Lilly would likely lose its parts customers due to the increased price. As to the impact of the Toyota line, Avery testified that new equipment revenue for Toyota was 1.9 million dollars while the total overall revenue for Lilly products was 6.2 million dollars. (Tr. II at 77.)

The Plaintiff disputes that Lilly will suffer irreparable harm. Yale points to the testimony of Thomas Clark who stated that loss of the Yale line in Memphis would only cause Lilly to revert to its June 2003 revenue level before taking on the Toyota line. (Yale's Findings at 22.) Additionally, Yale contends that the harm to the Defendant can be calculated in monetary terms as has been done by one of Lilly's experts who stated that the Memphis location would suffer $4,295,370 in lost

profits on a present value basis if it were terminated.  (Tr. II, Ex. 8 Deposition of Garry Bartecki at

113-114.)  Yale maintains that because damages can be quantified, the application for a preliminary

injunction must be denied.  (Yale's Findings at 22 (citing  11A Charles Alan Wright et al., Federal

Practice and Procedure § 2948.1 (2d ed. 1995)).)

     Turning first to the Nashville agreement, the Court finds that the middle Tennessee location

will likely suffer irreparable harm if Yale did not renew the agreement.  As Craig Avery related at

the injunction hearing, the dealership would likely be forced to "shut down" within 90 days.  (Tr. II

at 74.)  According to testimony for the Defendant, it would be extremely difficult to restore Lilly as

the Nashville dealer based on the loss of customers and the fact that Lilly might be viewed as an

unstable company with which to enter into a long-term service agreement.  Additionally, the damage

to the location's goodwill and financial status would be difficult to compute.  See Basicomputer

Corp., 973 F.2d at 512.

     With respect to the Memphis location, the Court concludes that it would also suffer

irreparable harm although to a lesser extent than the Nashville location.  Clark testified that loss of

the Yale line would cause Lilly's revenues to return to their pre-Toyota level.  (Tr. II at 63.)  The lost

profits for Memphis could be calculated based on Lilly's past growth rate and the time value of

money.  (See Tr. II, Ex. 8 Deposition of Garry Bartecki at 113.)  In Memphis, Lilly would continue

to be a going concern and would still have a product to sell and market to customers.  However,

some of Lilly's reputation and goodwill would be damaged by the cancellation of the dealership.

See Michigan Bell Tel. Co. v. Engler, 257 F.3d 587, 599 (6th Cir. 2001) ("Although the plaintiffs

may recoup their losses by raising rates, and consequently would not suffer irreparable financial

harm, there are other forms of irreparable harm which may befall them if the court does not enjoin"

the defendants.).  Although, not all of Lilly's goodwill would be damaged based on the addition of the Toyota line.  Accordingly, the Court finds that the Nashville location will suffer irreparable harm, as will the Memphis location, although to a lesser degree.  Of course, the Court must balance the harms which Lilly may suffer against those which Yale may endure.  Id.

### 3. Harm to Yale that might result if the injunction were issued

Yale claims that it will suffer harm due to misappropriation of pricing and strategic information in Memphis which Lilly might use to benefit Toyota.  Joseph Wheeler, a Yale dealer in North Carolina, testified at the June 1 hearing that pricing information is extremely sensitive in the forklift industry because "we can be talking about hundreds of trucks with someone and the monthly rate on a truck difference between us and a competitor could be $2 or $3 and we could lose the whole deal."  (Tr. II at 93.)  Yale also points to an email which Robert Camp received from a Toyota employee who was asking for pricing information for Yale trucks.  (Tr. II, Ex. 24 Camp dep. at 250-51.)  However, Camp insisted that "I've never given them pricing . . . [or] discount schedules."  (Tr. II, Ex. 24 Camp dep. at 251.)  Finally, Plaintiff submits that the "harm to Yale will be substantial if Yale is forced to continue in an unsatisfactory business partnership with a business partner that cannot be trusted."  (Yale's Findings at 23 (citing Joyce Beverages, 555 F. Supp. at 280).)

In contrast, Lilly maintains that Yale will not suffer any material harm if the Court grants an injunction because it would mitigate Yale's damages awaiting trial.  Lilly asserts that no dealer would be willing to come into either Memphis or Nashville uncertain as to whether Lilly might ultimately prevail at trial.  (Lilly's Findings at 20.)  As well, citing to its current Yale market shares for both Memphis and Nashville of 16.9% and 17.1%, respectively, Lilly asserts that it is making money for Yale and growing its customer base.  (Tr. II at 78.)  Furthermore, according to Lilly,

Plaintiff has permitted other dealers to sell competing equipment without suffering any irreparable harm. (Lilly's Findings at 21.) For example, Black Equipment Company promotes Clark and Linde products, both competitors with Yale in the lift truck industry. (Tr. I at 185-86.) Likewise, Inslee-McIntee represents both Yale and Crown. (Tr. II, Ex. 42 Costello dep. at 73.) Lilly highlights Clark's deposition testimony in which he stated that the commercial good faith and honesty provision would require Lilly not to share any Yale confidential information with a competitor. (Tr. II, Ex. 7 Clark dep. at 37.) In that regard, Donald Chance testified that he had no information demonstrating that Lilly had shared any confidential information with Toyota or any other competitor. (Tr. II, Ex. 49 Chance dep. at 132.)

Considering the evidence of irreparable harm presented by the parties, the Court finds that the balance of hardships tips in favor of Lilly with respect to both the Nashville and Memphis agreements. Although Yale could suffer irreparable harm if its pricing information was submitted to Toyota, it has not presented any evidence that this has happened in the past or that it is likely to happen in the future. (Tr. II, Ex. 49 Chance dep. at 132.) Additionally, other Yale dealers represent Yale and a competing manufacturer and thus have access to both Yale's and the competitor's prices. (Tr. II, Ex. 42 Costello dep. at 73.) Yet, the Plaintiff does not have the same concern that its other dealers might disclose confidential information to a competitor. Even though Lilly's market share for Yale in Memphis was much lower in 2004 than it has been in previous years, it is currently at 16.9%. (Tr. II at 78.) Moreover, Lilly presented testimony providing several explanations why its market share in 2004 was lower than expected. (Tr. II at 217-19.) Therefore, the Court concludes, if it were to grant Lilly's application for a preliminary injunction awaiting a trial on the merits, the harm to Yale would still be less than the harm that would result to Lilly with respect to either the Memphis or Nashville locations.

4.  Whether the public interest would be served by issuance of the injunction

As stated in the Court's initial order granting Lilly's application for a preliminary injunction, the Tennessee legislature has declared the public interest in § 47-25-1311 that a "retailer shall be entitled to injunctive relief against unlawful termination, cancellation, [or] nonrenewal . . . of the retail agreement." Tenn. Code Ann. § 47-25-1311(b);  see generally Power & Telephone Supply Co., Inc., 268 F. Supp. 2d at 987 (holding that provisions within the statutory framework of Tenn. Code Ann.  §§ 47-25-1301 et seq. were enacted by Tennessee to protect its retailers); Vanadium Corp. of Am. v. The Susquehanna Corp., 203 F. Supp. 686, 696 (D. Del. 1962) (acknowledging that the court was aware of the public interest to guard against violations of statutes).

Taking into consideration all four factors to be considered in ruling on a preliminary injunction, the Court finds that issuing a preliminary injunction is appropriate with respect to the Nashville location due to Lilly's high possibility of suffering irreparable harm and strong likelihood of success against nonrenewal.  The only arguable basis for terminating the Nashville agreement was Lilly's alleged violation of the commercial good faith and honesty clause.  Arguably, this provision could be the basis of nonrenewal of the agreement in Nashville since it does not seem to be limited to a locality and required Lilly to be to be fair and straightforward about its dealings with Toyota. See Glazer, 930 S.W.2d at 549-50  (defining "honesty" as "fairness and straightforwardness of conduct").  In addition, Yale does not appear likely to suffer any irreparable harm if it is enjoined from terminating the Nashville agreement because its market share has always remained close to 17% and there is no evidence that Lilly's employees are disclosing confidential information to Toyota employees.  Therefore, the Court GRANTS Lilly's application for a preliminary injunction as to the Nashville agreement.

With regard to the Memphis agreement, the Court finds that Lilly's application should be denied. Lilly has not demonstrated a strong likelihood of success on several of the grounds on which Yale seeks to not renew the agreement. The Court concluded that the Defendant likely failed to comply with the best efforts provision by allowing the same salesmen to market both Toyota and Yale to its customers from August 2003 to January 2004. (Tr. II, Ex. 7 Clark dep. at 71, Ex. 10 Avery dep. at 31, Ex. 33 Benetz dep. at 51.) Additionally, Lilly likely violated the commercial good faith and honesty clause when, according to Jon Levine, Avery plainly denied rumors that Lilly was interested in becoming a Toyota dealer only days after Lilly had sent a proposal to Toyota to accomplish that very relationship. (Tr. I at 151.) And, when Levine spoke with Avery on July 15, Avery stressed "we haven't signed anything" although a letter of intent had been signed by Clark only a week prior to the conversation. (Tr. I at 154; Tr. II, Ex. 15 Basu dep. at 84.) Furthermore, although Lilly would suffer irreparable harm in the form of loss of goodwill, it will still have the goodwill established with its Toyota customers. Also, the financial impact on the Memphis location would only require Lilly to return to its revenue levels obtained in June 2003 prior to taking on the Toyota line. (Tr. II at 63.) Even though the harm suffered by Lilly in the Memphis location may outweigh the harm suffered by Yale, Lilly's likelihood of success in preventing Yale from not renewing the agreement is not strong. Finally, the public interest declared in § 47-25-1311 only states that a retailer shall be entitled to injunctive relief against unlawful termination or nonrenewal, not lawful nonrenewal. See Tenn. Code Ann. § 47-25-1311(b). As discussed above, Yale has presented several grounds which could provide it lawful cause to refuse to renew the Memphis agreement. Thus, after considering all of the factors in connection with Lilly's applications for a preliminary injunction, the Court finds that Defendant's application is DENIED with respect to the Memphis agreement but GRANTED as to the Nashville agreement.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's applications for a preliminary injunction are GRANTED in part and DENIED in part.

**IT IS SO ORDERED** this 13ᵗʰ day of October, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 178 in case 2:03-CV-02561 was distributed by fax, mail, or direct printing on October 17, 2005 to the parties listed.

---

Mark S. Norris
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103--246

J. S. Wilson
WYATT TARRANT & COMBS
P.O. Box 775000
Memphis, TN 38177--500

Aubrey B. Harwell
LAW OFFICE OF AUBREY B. HARWELL, JR.
150 Fourth Ave. North
Nashville, TN 37219

Glen G. Reid
WYATT TARRANT & COMBS
P.O. Box 775000
Memphis, TN 38177--500

Ronald G. Harris
NEAL & HARWELL, PLC
150 Fourth Ave., N.
Ste. 2000
Nashville, TN 37219

Jon D. Ross
NEAL & HARWELL, PLC
150 Fourth Ave., N.
Ste. 2000
Nashville, TN 37219

Jeff Smith
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT